# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 02 B 10050 |
| Chicago Truck Center, Inc., | ) | |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| ———————————————— | ) | |
| | ) | |
| David Leibowitz, as Chapter 7 | ) | |
| Trustee for the Estate of Chicago Truck | ) | Adv. No. 04 A 1575 |
| Center, Inc., and not individually, | ) | |
| | ) | |
| Plaintiff, | ) | Judge Pamela S. Hollis |
| | ) | |
| v. | ) | |
| | ) | |
| General Motors Acceptance Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the Second Amended Complaint of David

Leibowitz, as Trustee of the Chapter 7 Estate of Chicago Truck Center (the "Trustee")

seeking to avoid as fraudulent certain transfers made by Chicago Truck Center, Inc.

("CTC") to General Motors Acceptance Corporation ("GMAC") under Sections

548(a)(1)(A) and (a)(1)(B) of Title 11 of the United States Code (the "Bankruptcy

Code")[1], 740 ILCS 160/5(a)(1) and (2) and 740 ILCS 160/6(a) (as adopted in Illinois, the

"UFTA") (the "Complaint"). After two days of trial and additional review of admitted

deposition testimony, documents, and post trial briefs, the court enters judgment on all

---

[1] Because the underlying bankruptcy case was filed in 2002, the court will apply the Bankruptcy Code in
effect prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.
See London-Marable v. Sterling, Adv. No. 06-00274-RTB, 2008 WL 2705374, *3 (D. Ariz. July 9, 2008).

counts in favor of the defendant GMAC and against the plaintiff, David Leibowitz, as

Chapter 7 Trustee for the Estate of Chicago Truck Center, Inc.

## THEORY OF CASE

The Trustee essentially alleges that GMAC conspired with its affiliate company

General Motors Corporation ("GM") and GM's long time customer, Penske Truck

Leasing ("Penske"), to strip the debtor CTC of its assets. Damages sought include money

CTC still owes to other creditors (approximately $9 million) and/or GM/GMAC profits

from keeping CTC alive to do business with Penske (about $74 million).

GMAC's position is that it financed CTC's purchase of vehicles from GM in

order to permit CTC to resell the vehicles to Penske. The only payments or transfers

GMAC received from CTC were for repayment of CTC's debts owed to GMAC as a

result of the floor plan financing arrangement, which was secured by the vehicles

financed. Other than CTC's repayment of this debt to GMAC, the Trustee appears to

acknowledge that no transfers were made by CTC to GMAC.

However, the Trustee points out that a fraudulent conveyance can include the

undertaking of an obligation by a debtor in addition to transfers from the debtor. He

asserts that an agreement between GM, CTC and Penske was such an "obligation", the

effect of which permitted Penske to be paid in full on a $3.6 million dollar debt owed to it

by CTC (the "Repayment Agreement"). Remarkably, the Trustee does not seek recovery

against the actual parties to the Repayment Agreement -- GM or Penske -- but sues only

GMAC, presumably hoping to argue that GM and GMAC are the same. Even assuming

GM and GMAC are alter egos of each other, the Trustee is simply complaining that

Penske and possibly GM/GMAC improved their position by receiving full payment on an

2

antecedent debt. Although such an improvement may constitute a preference over some creditors if close to the bankruptcy filing, it is not a fraudulent conveyance if the debtor simply repays a legitimate debt.[2] The evidence establishes that this is really all that happened here.

## JURISDICTION

Under 28 U.S.C. § 1334(a), the district courts have exclusive jurisdiction over bankruptcy cases. The District Court for the Northern District of Illinois referred its bankruptcy cases to the bankruptcy court of this district pursuant to 28 U.S.C. § 157(a) and its own Internal Operating Procedure 15(a). When presiding over a referred case, the bankruptcy court has jurisdiction under 28 U.S.C. § 157(b)(1) to enter orders and judgments in core proceedings within the case. This adversary is a core proceeding under 28 U.S.C. § 157(b)(2)(H) (proceedings to determine, avoid, or recover fraudulent conveyances). This court may therefore enter final judgments in these proceedings.

## FINDINGS OF FACT

In accordance with Federal Rule of Bankruptcy Procedure 7052(a), the court finds:

1.    Starting as early as the 1960's, GM sold new trucks to Penske, which is involved in the truck rental and leasing business. As part of this arrangement, GM bought back used trucks from Penske and resold them. These transactions were conducted through CTC, which was a truck dealer owned by GM. Accordingly, the Penske business initially started when GM was in control of CTC. (Kloepper Dep. 58, 231, Dec. 12, 2004.)

---

[2] Any improvement in position by Penske or GM/GMAC as a result of CTC entering into the Repayment Agreement could not be avoided as a preference under 11 U.S.C. § 547, since the Repayment Agreement or "obligation" arose outside the 90 day and one-year preference periods.

2.     In the early 1990's GM established Motors Holding Company ("MH") to increase minority ownership of automotive dealerships.  Subsequently, GM transferred its ownership interest of CTC to MH.  Also around that time Robert Hatcher ("Hatcher"), a minority individual, acquired a portion of CTC but not a controlling interest.[3]

3.     Beginning in 1993, CTC and GMAC entered into a financing relationship whereby GMAC provided floor plan financing to CTC.  This relationship began on December 2, 1993, when CTC and GMAC entered into a Wholesale Security Agreement and Floorplan Inventory Loan and Security Agreement (together with all related amendments, the "Financing Agreements").  (GMAC Ex. A, B.)  On January 10, 1994, GMAC perfected its security interest by filing a financing statement with the Illinois Secretary of State.  (GMAC Ex. K.)

4.     On November 16, 1994, CTC and GMAC executed additional amendments to the Financing Agreements, which gave CTC a delayed payment privilege ("DPP").  Under the DPP, when CTC sold a truck, GMAC would retain its security interest in the vehicle until the purchaser made payment directly to GMAC -- or to CTC and GMAC jointly.  (GMAC Ex. D.)

5.     On July 1, 1995, CTC and GMAC amended the Financing Agreements again, reflecting that under the DPP, CTC authorized the end purchaser (Penske in this case) to pay GMAC directly.  (GMAC Ex. D.)  CTC assigned its right, title and interest in the sale proceeds from the purchaser to GMAC, and authorized GMAC to direct the purchaser to deliver the DPP payment directly to GMAC.  Id.

---

[3] A GMAC credit report dated August 31, 1999 stated in part:  "...previously Mr. Hatcher held a 41% minority ownership interest while GMC Truck Motors Development Corporation (GTMDC) held a 59% majority interest. GTMDC is a holding company jointly owned by the GMC and Motors Holding Divisions."  (Ex. 4 to Kloepper Dep.)

4

6.    In April of 1998, Hatcher bought out GM/MH, and became the sole shareholder and president of CTC.

7.    On several occasions, GMAC amended its security agreements, filed continuation statements to ensure perfection of the floor plan arrangement and caused CTC to enter into new security agreements both before and after Hatcher gained full control of CTC.

8.    On March 29, 1999 GMAC wrote Penske a letter informing Penske that GMAC was financing CTC and that Penske should pay GMAC directly for the new trucks purchased from CTC, pursuant to CTC's assignment to GMAC.

9.    Even prior to the year 2000, CTC had pledged virtually all its assets to GMAC in exchange for the floor plan financing. (Trial Tr., vol. 2, 101, Oct. 19, 2007.)

10.    In a letter dated July 28, 1999, CTC President Hatcher thanked GM for helping CTC to *retain* the Penske business by securing Penske's commitment to buy 2000 and 2001 model year trucks from CTC. The letter stated in part:

> As you are aware, last week Penske committed to approximately 8,500 orders, over the next two model years, consisting of 3000 medium duty units and 5500 vans…The General Motors Team …was a vital part of this success….As you know, retaining an account the size of Penske Truck Leasing is extremely difficult, given the complexity of these deals and current competitive climate…" (Kl. Ex. 3.)[4]

11.    On August 31, 1999, a GMAC credit report noted that CTC was experiencing negative cash flow but indicated: "The overall profitable operating results and the protection afforded by DPP procedures provide a basis to recommend approval of the proposed credit lines until September 30, 2000…" (Kl. Ex. 4.)

---

[4] The majority of the Trustee's exhibits are sub-exhibits to its Exhibit 33, the Deposition of Norm Kloepper. Mr. Kloepper monitored the CTC account for GMAC. All references to these sub-exhibits will be cited as Kl. Ex. __.

12.     On May 30, 2000, Hatcher and his wife, Carolyn Hatcher, each executed a personal guaranty in favor of GMAC (the "Guarantees"). (Kl. Ex. 15, 16.)

13.     At least as of the date of a memo written on July 25, 2000, GMAC was aware that approximately $3.5 million collected by CTC for selling Penske's used trucks was not paid to Penske. Of that amount, GM had given CTC $1.4 million to reimburse Penske for used vehicle trade-ins accepted by GM, but CTC did not remit those funds to Penske. The remaining $2.1 million was from trade-ins that CTC sold but never paid to Penske. (Kl. Ex. 28.)

14.     Instead of paying Penske the proceeds of used trucks sold by GM and CTC, Hatcher used the money to purchase two Ford dealerships. Those dealerships were not successful and were ultimately shut down in 2000. Id.

15.     This diversion of funds caused CTC to run short of cash and jeopardized its ability to retain Penske as a customer. GMAC recognized that the Penske contract historically represented over 75% of CTC's business and losing the contract would likely cause CTC to fail. Id.

16.     GMAC was not an "insider" of CTC. No evidence was presented demonstrating that GMAC in any way controlled CTC business decisions or the hiring and firing of CTC employees or officers. Receipt of financial reports and the issuance of guarantees by principals of a borrower are common features of any lending relationship and were not sufficient to transform GMAC into an insider of CTC. GMAC lacked any meaningful control over Hatcher; indeed, he was able to divert millions of dollars out of CTC for other ventures.

17.    On August 24, 2000, GMAC caused CTC to execute another security agreement. GMAC attempted to get as much security as it could to protect itself while continuing to do business with CTC. (Kloepper Dep. 133-136.)

18.    A few days after GMAC obtained this additional security agreement, on August 28, 2000, a conference call occurred between employees of MH, GM and GMAC. (Kl. Ex. 39.) During the call, one MH employee stated CTC could not survive another 60 days without a capital infusion. Kloepper of GMAC did not agree, believing that CTC could continue to do business beyond that time. (Trial Tr., vol. 1, 61, Oct. 18, 2007.) In particular, Kloepper thought that Penske would probably continue to do business with CTC if the $3.6 million debt was repaid. Also, if Penske renewed its contract with CTC in the fall of 2001, CTC could survive. (Trial Tr., vol. 2, 103-104, Oct. 19, 2007.)

19.    Kloepper, his boss Hinz and GMAC attorney Peterson participated in a second conference call on August 28, 2000, with GM and MH representatives. Peterson indicated that "...the three party agreement could be drawn up to limit our lender liability concerns regarding control of future Penske proceeds as well as the bankruptcy concerns..." (Kl. Ex. 39, p. 3.) The participants agreed to investigate whether GM would assume an equity position in CTC or guarantee "the proposed loan." Id.

20.    Bankruptcy was always considered by GMAC. While it was possible that CTC could have filed bankruptcy around that time, CTC stayed in business for two more years after the discussion about avoiding bankruptcy, preference actions and lender liability issues. (Trial Tr., vol. 1, 89-90.) There is no evidence to suggest that GMAC felt CTC's bankruptcy was imminent.

21.     Meanwhile, around the time of these conference calls, Penske threatened to buy Ford trucks if it was not paid the $3.6 million owed by CTC within a week.  GM's annual profit from the Penske deal amounted to about $12 million and GM had already incurred plant production expenses of $8 million in anticipation of the Penske orders. Penske promised a long term deal to purchase GM product if the CTC debt was paid. GM Fleet represented that Hatcher agreed to do whatever was necessary to keep the Penske business.  (Kl. Ex. 39, p. 1.)

22.     Notwithstanding CTC's troubles in the summer of 2000, and GM's desire to continue with the Penske business, MH refused to recapitalize CTC by purchasing an equity interest, and GMAC declined to loan funds to CTC without a GM guarantee of the loan.  Id. at p. 2.

23.     About a month later, on October 3, 2000, GMAC informed CTC that CTC was not providing reliable operating reports, its cash position was negative, there was a significant decline in CTC's net worth, and principal and interest payments were not remitted in accordance with the Financing Agreements.  As a result of this "grim" situation, GMAC told CTC to either seek alternative financing or come up with a realistic and detailed business plan within 60 days "...to provide immediate improvements and ensure the future viability of the dealership." (Pl. Ex. 35 (emphasis in original).)  Absent an acceptable turnaround plan, GMAC would cease financing CTC after January 2, 2001. Id.

24.     A few days later, on October 6, 2000, Kloepper learned from Hatcher that GM, CTC and Penske reached a deal, defined in this opinion as the Repayment Agreement, to pay back CTC's $3.6 million debt to Penske by discounting the price

8

Penske would pay for GM trucks. The discounts would be issued both by GM and CTC. GMAC was not directly involved in the creation of this agreement and questioned the specifics of the arrangement as expressed in Kloepper's memo of October 9, 2000. (Kl. Ex. 25.)

25.    Hatcher also told Kloepper that a number of deals were pending that might help CTC to survive. Hatcher stated that CTC could recover some funds from Ford through litigation over the unsuccessful dealerships; that MH was going to purchase Hatcher's Wisconsin store for $220 million, and that LaSalle Bank was considering a loan to CTC, which would take out Cole Taylor Bank and provide Hatcher with about $1.5 million in working capital. Kloepper also mentioned cost cutting measures taken by CTC in light of its cash crunch. He told Hatcher that GMAC's credit line with CTC expired and there was no guarantee it would be renewed. Renewal could depend on the LaSalle Bank loan approval to provide working capital and/or an agreement that would address the Penske debt. Id. at p. 2.

26.    A day later, GMAC referenced the Repayment Agreement in a memo to GM dated October 10, 2000. This memo tried to confirm that some type of agreement was reached between GM, Penske, and CTC on October 6, 2000 -- and GMAC requested a copy of the agreement. The memo raised a number of questions about how Penske would be repaid by discounting truck prices. This memo and Kloepper's testimony demonstrate that the GMAC employees monitoring the CTC relationship were not directly involved in negotiating the Repayment Agreement. (Kl. Ex. 25.)

27.    The Repayment Agreement terms were summarized in a memo dated October 12, 2000, from GMC Truck Center to Penske and copied to Hatcher and other

individuals. It is unclear if GMAC received a copy at that time. The memo stated that Penske's 1999 contract to purchase trucks from GM and CTC would be amended to discount the price of 2,600 Savana trucks by $500 each and 1,300 C Series trucks by $1000 per unit. These discounts given by GM to Penske totaled $2,600,000. CTC would further reduce the price of the trucks by $270 each, for a total of $1,053,000. The combined discounts to Penske would amount to $3,653,000 and would repay the debt CTC owed Penske for converting the used truck sales proceeds. (Kl. Ex. 36, p. 1.)

28.     The $270 discount promised from CTC was memorialized in writing on December 15, 2000 and signed by Hatcher. (Pl. Ex. 36.)

29.     The transactions under the Repayment Agreement were invoiced net of the discounts. (Kl. Ex. 36.) The discounts from General Motors and CTC were never transferred to GMAC's books. (Id.; Trial Tr., vol. 2, 65.) All discounts to Penske were deducted from the invoices before GMAC paid them on behalf of CTC. (Trial Tr., vol. 1, 118; Trial Tr., vol. 2, 59-61, 63-65, 76-78.)

30.     As late as October 31, 2000 GMAC was still trying to get a written copy of the Repayment Agreement. (Kl. Ex. 35.) GMAC had no involvement in the negotiations with Penske and did not direct Hatcher to enter into the Repayment Agreement. (Trial Tr., vol. 1, 87.)

31.     The discounts offered by CTC and GM eventually repaid the CTC debt to Penske, and the majority of the debt was paid by April of 2001. (Trial Tr., vol. 2, 103.) GM contributed most of the funds for repayment of the Penske obligation by offering much larger discounts on the truck prices than CTC. GM repaid $2.6 million while CTC

only paid about a million—even though CTC's Hatcher diverted the whole $3.6 million from Penske.

32.    On April 11, 2001, Hinz of GMAC again notified CTC that it was terminating the financing relationship.[5] Reasons given were that CTC was continuing to lose money, missed forecasts, never provided the requested business plan, and failed to pay federal excise taxes for year 2000. Again, GMAC indicated it would only continue the floor plan financing for an additional 90 days so that CTC could find alternative financing. (Kl. Ex. 38.)

33.    CTC's credit lines from GMAC expired on August 29, 2001. (Kl. Ex. 11, 12.) As of August 31, 2001, CTC was in a critical cash position, and needed approximately $4 million to recapitalize. Id. CTC was also in arrears on Federal Excise Tax in the amount of approximately $576,000 plus interest and penalties.[6] (Kl. Ex. 12.)

34.    GMAC froze CTC's credit lines because GMAC could not get financial statements and "[h]e [Hatcher] owed other creditors money and wasn't able to pay it all back." (Kloepper Dep. 81-82.) Hatcher's conversion of the Penske used truck proceeds was also a factor in GMAC's decision. (Id. at 112-113.)

35.    CTC was unable to obtain alternative financing, and despite GMAC's attempts to cease doing business with CTC, the relationship was not fully terminated until CTC's bankruptcy. (Trial Tr., vol. 2, 103.)

36.    Penske refused to enter into a new truck purchase contract with CTC in the fall of 2001, and this was a significant factor in CTC's demise in February and March

---

[5] GMAC previously tried to terminate the relationship in October of 2000, around the same time the Repayment Agreement was entered into between CTC and Penske.

[6] Kloepper Deposition Exhibit 12 indicates that CTC was in arrears in the amount of $576 million, however, testimony at trial indicates that the amount was $576,000.

2002. Had Penske entered into a new agreement, CTC would have survived. GMAC had
no control over Penske's decision not to continue business with CTC. Id. at 104.

37.    On March 13, 2002, employee unions filed an involuntary petition against
CTC under Chapter 7 of the Bankruptcy Code, citing CTC's debts for union dues and
compensation. On April 18, 2002, an order for relief was entered by the bankruptcy court
against CTC.

38.    On May 21, 2002, GMAC filed a Motion to Modify Automatic Stay.
The Trustee did not challenge the validity or perfection of GMAC's security agreements.
GMAC's motion was granted on August 28, 2002, and virtually all of GMAC's debt was
satisfied through liquidation of the CTC collateral.

39.    On March 10, 2004, shortly before the deadline for commencing
avoidance actions expired under 11 U.S.C. § 506(a), the Trustee filed several avoidance
actions.

40.    Two days later, on March 12, 2004, the Trustee commenced the instant
adversary proceeding against GMAC, seeking an accounting for the collateral liquidated
after modification of the stay and relief under various theories of fraudulent transfer. The
Trustee did not sue GM or Penske – the actual parties to the Repayment Agreement.

41.    GMAC and GM are separate corporations. (Trial Tr., vol. 1, 100.) Their
books are kept separately. (Trial Tr., vol. 2, 106.)

42.    In the memo recounting the conference calls on August 28, 2000: "It was
made clear that GMAC would advance NO FUNDS W/OUT A GM GUARANTEE."
(Kl. Ex. 39. p. 2 (emphasis in original).) Clearly, GM and GMAC were acting separately
in accordance with own independent interests. The fact that GMAC or GM attorneys met

12

with GM, GMAC and MH employees to discuss CTC's conversion of funds and
subsequent difficulty with a big customer is not sufficient to overcome the independence
of GM and GMAC. GM manufactured the trucks that GMAC financed for CTC. It
would be natural for the companies to confer if a dealer stole millions of dollars from a
large truck purchaser.

     43.    GMAC was not a party to the Repayment Agreement, and Kloepper had
no knowledge of anyone from GM demanding that GMAC continue financing CTC.
(Trial Tr., vol. 2, 107-108.) GMAC received no benefit from the Repayment Agreement
other than payments in the ordinary course to reduce debt under the secured floor plan
arrangement. Indeed, the discounts agreed to by CTC, GM and Penske reduced the
amount GMAC financed. GMAC would have made more money on interest from the
floor plan arrangement if no discounts, or smaller discounts, were given.

     44.    The Trustee's expert Kenneth Malek did not demonstrate that GMAC
received a fraudulent transfer or benefitted in any way from the obligations under the
Repayment Agreement. The bulk of his testimony consisted of trying to show that the
Repayment Agreement preferred Penske over other creditors because it transformed
Penske's unsecured debt into a secured debt.

     45.    However, the Repayment Agreement was entered into and completed
well outside the Bankruptcy Code's preference period, so an improvement in position of
one creditor would be permissible. Additionally, Malek is not correct. The discounts
were subtracted from the purchase price of the trucks *before* GMAC financed them.
Accordingly, GMAC's Financing Agreements did not secure payment of the discounts to

Penske and logically did not play a role in transforming the unsecured Penske obligation into a secured one.

46.     Malek admitted that the debt repaid was owed to Penske and not GMAC. He was unable to dispute that all discounts were applied before invoices were forwarded to GMAC for payment and he acknowledged that GMAC did not grant any discounts to Penske. (Trial Tr., vol. 2, 46, 49-50.)

47.     Malek did not realize that GM, a non-debtor, paid two thirds of the Penske debt he complained was transformed into a secured debt of CTC. Id. at 61-62. He also did not realize that Penske's direct payment to GMAC for trucks sold by CTC was the usual practice even before the Repayment Agreement was reached. Id. at 68.

48.     At most, Malek could only argue that GM benefitted from the Repayment Agreement because it earned a profit from the sale of the trucks to Penske. Id. at 86-88. He incorrectly assumed that a benefit to GM was a benefit or transfer to GMAC, a wholly separate corporation. Malek was not offered as a legal expert, and the court gave little weight to his analysis that GM and GMAC were "one" because they conducted business for their mutual benefit.

49.     Other than unsupported statements and innuendos delivered by Trustee's counsel, there was no suggestion from the testimony or documents that GMAC was acting in concert with GM and Penske to destroy CTC after the Penske debt was repaid. For at least two years before CTC failed, GMAC repeatedly expressed concern that CTC was not paying other creditors and encouraged CTC to obtain alternative financing.

50.     The evidence was never clear as to when CTC became insolvent or undercapitalized. Trustee's exhibits 1-30 are operating reports submitted by CTC to

GMAC. These reports showed positive net worth of over $4 million in June of 1999, and monthly fluctuations in that amount, including a negative net worth of $300,970 during the winter months of 2001, but a reversal and positive net worth of over a half million dollars as of September 2001. At the time CTC entered into the Repayment Agreement on or about October 2000, its reports showed a positive net worth.

51.    Hatcher's diversion of $3.6 million dollars out of CTC was the principal cause of CTC's insolvency and undercapitalization, prompting Penske to ultimately abandon its relationship with CTC after GM and CTC repaid the $3.6 million. The conversion of funds and Penske's decision not to continue business with a company led by Hatcher was the principal reason for CTC's failure. If anything, GMAC's continued assistance with financing, despite its desire to terminate the relationship, and GM's repayment of most of the Penske debt, improved CTC's balance sheet.

52.    No evidence was submitted to determine what debts of CTC were incurred as a direct result of performing under the Repayment Agreement and whether such debts exceeded the amount paid off by the Repayment Agreement.

53.    No evidence was presented to show that if the Repayment Agreement had not been entered into that CTC would have immediately stopped operating and incurring more debt. Although Penske constituted about 70 percent of CTC's business, Hatcher always thought something would bail him out: a loan from LaSalle, litigation with Ford, etc.

54.    The Trustee never demonstrated that CTC would have voluntarily stopped operating once Penske left. In fact, CTC did not stop until the unions pulled the plug and forced it into bankruptcy.

## LEGAL DISCUSSION

Count 1 of the Trustee's complaint against GMAC is brought under 740 ILCS

160/5, which provides in pertinent part:

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as
> to a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor
> made the transfer or incurred the obligation:
>
> > (1)   with actual intent to hinder, delay or defraud any
> > creditor of the debtor; or
> >
> > (2)   without receiving a reasonably equivalent value in
> > exchange for the transfer or obligation...

Count 2 is brought under 740 ILCS 160/6, which provides that:

> (a)   A transfer made or obligation incurred by a debtor is fraudulent as
> to a creditor whose claim arose before the transfer was made or the
> obligation was incurred if the debtor made the transfer or incurred
> the obligation without receiving a reasonably equivalent value in
> exchange for the transfer or obligation and the debtor was
> insolvent at that time or the debtor became insolvent as a result of
> the transfer or obligation.

Counts 3 and 4 are brought under Section 548(a)(1)(A) and Section 548(a)(1)(B)

of the Bankruptcy Code, which provide in relevant part:

> (a)(1)   The trustee may avoid any transfer of an interest of the debtor in
> property, or any obligation incurred by the debtor, that was made
> or incurred on or within one year before the date of the filing of the
> petition, if the debtor voluntarily or involuntarily --
>
> > (A)   made such transfer or incurred such obligation with actual
> > intent to hinder, delay, or defraud any entity to which the
> > debtor was or became, on or after the date that such transfer
> > was made or such obligation was incurred, indebted; or
> >
> > (B)   (i)   received less than a reasonably equivalent value in
> > exchange for such transfer or obligation; and
> >
> > (ii)   (I) was insolvent on the date that such transfer was
> > made or such obligation was incurred, or became
> > insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was
about to engage in business or a transaction, for
which any property remaining with the debtor was
an unreasonably small capital; or

(III) intended to incur, or believed that the debtor
would incur, debts that would be beyond the
debtor's ability to pay as such debts matured.

## I.    The Trustee Must Prove that CTC Made a Transfer or Incurred an Obligation to GMAC.

Both the Bankruptcy Code and corresponding sections of the UFTA depend on a

"transfer" of property having occurred. Edgewater Med. Ctr. v. Edgewater Prop. Co. &

PGR Props., Inc. (In re Edgewater Med. Ctr.), 373 B.R. 845, 852 (Bankr. N.D. Ill. 2007).

"If no transfer has taken place, there is nothing to avoid or recover." Id.

The UFTA defines a "transfer" as "every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with an asset or an

interest in an asset, and includes payment of money, release, lease, and creation of a lien

or other encumbrance." 740 ILCS 160/2(l). "The requirements for showing a fraudulent

transfer under the Bankruptcy Code are analogous to those as under the Illinois Uniform

Fraudulent Transfer Act." In re Securities Investor Prot. Corp. v. R.D. Kushnir & Co.,

274 B.R. 768, 780 (Bankr. N.D. Ill. 2002). The Bankruptcy Code similarly defines a

"transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing of or parting with property or with an interest in property,

including retention of title as a security interest and foreclosure of the debtor's equity of

redemption." 11 U.S.C. § 101(54).

Bankruptcy Code Section 548 and the UFTA provide not only for the avoidance

of fraudulent *transfers* of property, but also for the avoidance of "*obligations*" that are

deemed fraudulently incurred. In re Telesphere Comm., Inc., 179 B.R. 544, 554 n.11
(Bankr. N.D. Ill. 1994). If an insolvent debtor incurs an obligation without fair
consideration, the obligation itself, as well as the transfer of any collateral, would be
avoided. Id. (citing Covey v. Commercial Nat'l Bank of Peoria, 960 F.2d 657, 661 (7th
Cir. 1992)).

It is the Trustee's burden to show that either CTC transferred value or incurred an
obligation to GMAC that was intended to impair other creditors, or resulted in CTC
receiving less than "reasonably equivalent value" for what CTC gave up to GMAC.

## A. CTC Made No Avoidable Transfers to GMAC.

The only transfers made by CTC to GMAC were for payment of trucks that were
financed by GMAC under the floor plan arrangement and the security interests to secure
the loans. CTC trucks and parts served as collateral for CTC's debt to GMAC and
GMAC properly perfected its security interest in the collateral. GMAC obtained
modification of the stay in this bankruptcy and liquidated the collateral. GMAC
recovered no more from the collateral than the amount owed it by CTC under the floor
plan.

Although GMAC refined and expanded the nature of its financing agreements
with CTC at various times, all amendments were accomplished well outside any time
period shortly before CTC's bankruptcy. As a result, GMAC's security interest could not
be avoided as a preference over creditors under 11 U.S.C. § 547 on the basis that
GMAC's position was improved within one year (if an insider of CTC) or 90 days prior
to CTC's bankruptcy.

18

In contrast, the fraudulent transfer statutes apply to transactions spanning up to four years prior to CTC's bankruptcy, so some of GMAC's amendments to its financing statements and security agreements may have fallen within the reach of those avoidance provisions. However, a debtor's transfer of collateral to secure an antecedent debt or satisfaction of a debt is always "value", even though the security agreement might prefer one creditor over another.[7]  Moreover, such transfers and payments to satisfy the secured debt are almost always for reasonably equivalent value and not fraudulent. Anand v. Nat'l Republic Bank of Chicago, 210 B.R. 456 (Bankr. N.D. Ill. 1997), aff'd 239 B.R. 511 (N.D. Ill. 1999); Reaves v. Comerica Bank – California (In re GTI Capital Holdings, Inc.), 373 B.R. 671 (Bankr. D. Ariz. 2007). As explained in these cases, if GMAC received more money from the sale of the collateral than the amount CTC owed to it, then GMAC would have been required to turn over the excess to CTC or its estate. The secured creditor would keep no more than it was owed by the debtor, thus satisfying the "reasonably equivalent value" test. That is precisely why the Trustee originally sought an accounting of GMAC's collateral sales in this proceeding -- hoping to recoup any sales proceeds in excess of CTC's debt to GMAC.[8]  CTC received reasonably equivalent value for the security agreements and payments on the floor plan debt transferred to GMAC. Accordingly, none of those transfers are avoidable under either bankruptcy or state law.

---

[7] 11 U.S.C. § 548(d)(2) states securing and/or satisfaction of a present or *antecedent* debt is "value". Hence, the only issue is whether the value exchanged is "reasonably equivalent". The Trustee's expert appeared to confuse fraudulent transfers with preferences, arguing that the discount agreement transformed an unsecured debt into a secured one and suggesting this was inappropriate. But "...preference law must not be confused with fraudulent transfer law." Reaves v. Comerica Bank – California (In re GTI Capital Holdings, Inc.), 373 B.R. 671, 680 (Bankr. D. Ariz. 2007) (citing In re United Energy Corp., 944 F.2d 589, 596 (9th Cir. 1991)). As long as the GMAC transactions occurred outside the preference periods, and they did, GMAC was within its rights to improve its position, including taking more security from CTC and seeking guarantees.

[8] As it turns out, the sales were just a bit short of the debt owed to GMAC.

## B. CTC Incurred No Avoidable Obligation to GMAC.

Unable to avoid CTC's actual transfers to GMAC, the Trustee maintains that CTC

incurred an "obligation" to GMAC that is avoidable. During the trial it was unclear

exactly what that "obligation" was. The evidence established that the only obligation

incurred to GMAC was the floor plan arrangement, which was not fraudulent.

Apparently, the Trustee wants a finding that GMAC either is GM or conspired with GM

and Penske to harm CTC's creditors. His argument can best be summarized with an

excerpt from his post-trial memorandum:

> In sum, it is clear from the evidence that CTC was never more than a prop
> that GM/GMAC used in a stage show that was needed to kept [sic] the
> Penske fleet business. GM's Minority Holding Company owned CTC,
> then gradually sold minority interests to Hatcher. Shortly after Hatcher
> acquired full ownership, CTC was swamped by its serious financial
> difficulties. CTC was insolvent at least since 1999. At the same time as
> CTC was going under, MHD was selling Hatcher other dealerships.
> GM/GMAC lost control when they squeezed too much out of CTC and
> Hatcher tried to salvage the wreck by misappropriating $3.5 million owed
> to Penske. Faced with the loss of the all important Penske business,
> GM/GMAC raised CTC from the grave into which its long-standing
> insolvency and the $3.5 million conversion had put it, and pushed their
> new zombie back into the world of commerce with a 100,000 jolt in the
> form of the Penske Obligation. But, like all zombies, CTC needed new
> blood, which it found in the form of goods and services from its vendors
> and employees. However, the zombie was bested by its vampire
> controller, GM/GMAC, which sucked that new blood right back out, and
> CTC eventually was placed involuntarily in its Chapter 7 tomb.
>
> It was a sophisticated plan that was efficiently executed with arrogant
> contempt for the law, other creditors, and basic morality.

Pl. Post-trial Memo at p. 14.

The "obligation" referred to in his post trial memorandum is the Repayment

Agreement. However, the evidence was clear that GMAC was not a party to this

agreement or obligation. GMAC did not grant discounts to Penske, it simply continued to finance trucks sold by CTC to Penske, *net of the discounts* given by GM and CTC to Penske. GMAC was not involved in the negotiation of this obligation and in fact asked a number of questions about the agreement after it was made between GM, CTC and Penske. There simply was no evidence of any conspiracy between GM and GMAC to keep CTC alive so GM could profit, other than the Trustee's hyperbole.[9] It cannot be proved by merely asserting the conspiracy was concealed.

The only way the Trustee can pin this obligation on GMAC is to prove that GM and GMAC were alter egos. Courts are reluctant to disregard the corporate form, however. Judson Atkinson Candies, Inc., v. Latini-Hohberger Dhimantec, 529 F.3d 371, 379 (7th Cir. 2008). In order to do so, the Trustee must make "a substantial showing that the corporation is really a dummy or sham for a dominating personality." Id. at 380 (citing Rosier v. Cascade Mountain, Inc., 855 N.E. 2d 243, 251 (Ill. App. Ct. 2006)). There is no evidence of that. The corporations were separate and the books and records were separate. This is illustrated by GMAC's insistence that GM guarantee any capital loan that GMAC might consider extending to CTC. Alter egos don't ask for guarantees. It is useless to guarantee one's own risk. The corporations are and were independent legal entities, which cannot be collapsed into one company just because an internal memo uses a "/" between GM and GMAC. Citibank, N.A. v. Hicks, No. Civ. A. 03-2283, 2004 WL 945142, *4 (E.D. Pa. Apr. 29, 2004) (blurred distinction between related entities is insufficient to conclude entities are alter egos).

---

[9] The Trustee's Post-Trial Memorandum was presented as a work of fiction, complete with headings entitled "The Dust Jacket", "Plot Synopsis", "The Characters", and "The Novella in the Form of Argument". While entertaining, much of his story was fiction and not supported by the evidence.

Nor can the fact that two companies act or meet for their mutual benefit dissolve

their separate legal existence. This would mean that parties on the opposite side of a

contract, if their business benefits both, become the same legal entity. That is absurd and

no authority is referred to in support of this concept. Indeed, cases have held just the

opposite. See, for example, United States v. Carey (In re Wade Cook Fin. Corp.), 375

B.R. 580, 599 (B.A.P. 9th Cir. 2007), where the court observed:

> Merely that a corporation is the owner of the stock of another and that the two are
> intimately related in carrying on their business for the purpose of mutual benefit is
> not enough to characterize a corporation as the alter ego of the other corporation.
> H.E. Briggs & Co. v. Harper Clay Products Co., 150 Wash. 235, 272 P. 962, 963
> (Wash. 1928) (quoting First National Bank v. Walton, 146 Wash. 367, 262 P. 984,
> 986 (Wash. 1928)). Rather, there must be such a commingling of the affairs of
> two corporations as to work an injustice on third parties if their separate status is
> recognized, in order for the court to hold the two corporations are, in effect, one
> legal entity. H.E. Briggs & Co., 272 P. at 963. "'[T]heir property rights [must be]
> so commingled and their affairs so intimately related in management as to render
> it apparent that they are, in fact and in intent, one, and, so related, to have them
> regarded otherwise would work a fraud upon third persons.'" Id. (quoting First
> National Bank, 262 P. at 986).

See also, In re Chateaugay Corp., 139 B.R. 598, 603 (Bankr. S.D.N.Y. 1992).

The Trustee could have sued GM or Penske but elected to pursue GMAC -- the

one entity that was not a party to the obligation or Repayment Agreement. Accordingly,

CTC assumed no "obligation" to GMAC that could be avoided as fraudulent.

## II. Even if CTC's Repayment Agreement Obligations Extended to GMAC, the Repayment Agreement is Not Avoidable.

Putting aside the Trustee's failure to sue the actual parties to the obligation

claimed fraudulent, this case is riddled with faulty assumptions and causation issues. To

begin with, the Repayment Agreement's purpose and result was to repay money that CTC

owed to Penske. As discussed earlier, a debtor's repayment of a valid debt is not a

fraudulent transfer provided the debtor does not ultimately transfer more value than what

is owed. "The payments reduced the debtor's liability on the fraud claims; therefore, the estate had received reasonably equivalent value in the amount by which the fraud claims were reduced." GTI Capital, 373 B.R. at 679. This case is even more compelling. CTC only contributed $1,053,000 toward reduction of the $3.6 million debt to Penske, while GM contributed the lion's share -- $2,600,000. Effectively, the Repayment Agreement eliminated CTC's $3.6 million debt to Penske for a little over a million dollars of CTC funds. This was not just reasonably equivalent value; it was a great deal for CTC.

Next, the Trustee assumed that CTC would have stopped operating if it did not incur the Repayment Obligation. There was no proof of that other than a general consensus that Penske was 70-75% of CTC's business. The evidence actually contradicts this assumption. CTC lost Penske as a customer but kept operating right up until the unions put it into involuntary bankruptcy. Another admission by the Trustee contradicts his chain of causation. His pleadings and briefs allege that CTC was probably insolvent or undercapitalized from its inception. The evidence is inconclusive, but if the Trustee is right, CTC always operated without proper capital, and the Repayment Agreement would not have necessarily been the proximate cause of CTC's debt level at the time it was forced into bankruptcy.

Even if the Trustee could have established that the Repayment Agreement was the sole reason CTC remained in business, he failed to show what portion of the bankruptcy debt was incurred during the time CTC carried out the Repayment Agreement obligations. The Trustee's request for nine million dollars assumes that every dollar claimed by creditors in the bankruptcy flowed from CTC's performance of the Repayment Agreement. Particularly because the Trustee alleges CTC was always

23

undercapitalized, this court would have no way of determining if the Repayment Agreement caused CTC to incur more debt than what paid off under the obligation. It is entirely possible that continued operations reduced CTC's liabilities, because GM contributed so much toward the $3.6 million debt. Avoiding the Repayment Agreement might very well render the estate worse off. Under the evidence presented, the court cannot determine whether the Repayment Agreement stripped CTC of its assets or actually improved its balance sheet.

While the Trustee presented evidence that GM earned millions in profits by wholesaling trucks to CTC for resale to Penske, very little time was spent on how GMAC benefitted. There was some deposition testimony that GMAC lost money following liquidation of the collateral, but not a significant amount. There was trial testimony that GMAC made money charging interest under the floor plan but earned less as a result of the truck discounts given under the Repayment Agreement. The Trustee simply has not established what the avoidance of the Repayment Agreement would require GMAC to return. Effectively, he gambled that this court would agree that an internal memo's use of a "/" between GM and GMAC would permit this court to disregard the independence of these two corporations and enter a judgment requiring GMAC to pay the estate millions of dollars of profit earned by GM. He is wrong.

After reviewing all of the evidence, this court concludes that GMAC was trying to help CTC retain Penske as a customer. It may have profited by financing CTC, but capitalism is not offensive. GMAC is not the bad guy in this case -- just a deep pocket. Hatcher converted over $3.6 million of CTC funds that should have been used to pay Penske. GM repaid most of the converted funds back to Penske. GMAC certainly was

not willing to recapitalize CTC without a guarantee from GM, and that did not materialize. GMAC neither directed GM nor was it dictated to by GM in attempting to resolve the Penske problem.

There was no evidence that GMAC knew Penske would take its business elsewhere once the CTC debt was repaid. On the other hand, it was patently clear that Penske was going to leave if its debt was not paid. GMAC could have logically concluded that the only way to ensure payment of all of CTC's creditors was to keep Penske as a CTC customer, and the only hope of that was repayment of the money Hatcher took. The Trustee failed to show that GMAC intended to defraud, delay or hinder CTC's creditors and failed to prove that CTC did not receive reasonably equivalent value for the transfers and obligations running to GMAC.

## CONCLUSION

For the reasons stated above, judgment is entered under 11 U.S.C. §§ 548(a)(1)(A) and (a)(1)(B) and 740 ILCS 160/5(a)(1) and (2) and 740 ILCS 160/6(a) in favor of the defendant, General Motors Acceptance Corporation, and against the plaintiff, David Leibowitz, as Chapter 7 Trustee for the Estate of Chicago Truck Center, Inc.


ENTERED:


DATE: **DEC - 3 2008**

PAMELA S. HOLLIS
United States Bankruptcy Judge